UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
LONDON

| | | |
|---|---|---|
| DR. SAMEER SUHAIL and DR. OMAR SUHAIL, | ) ) ) | |
| Plaintiffs, | ) ) | Civil No. 13-122-GFVT |
| V. | ) ) | **MEMORANDUM OPINION** |
| UNIVERSITY OF THE CUMBERLANDS, | ) ) ) | **&** **ORDER** |
| Defendant. | ) ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

The University of the Cumberlands, a private University located in Williamsburg, Kentucky, recently developed a Clinical Psychology Ph.D. Program.  [R. 1 at 2.]  The Plaintiffs, brothers Omar and Sameer Suhail, were students in the program's inaugural class and now sue the University for changes made to the program's curriculum subsequent to their enrollment.  This matter is before the Court on the parties' cross motions for Summary Judgment.  For the reasons that follow, each of the parties' motions will be DENIED in PART and GRANTED in PART.

**I**

In 2009, Dr. Peter Geissler pitched the "idea of blending a medical model and a clinical model in a Ph.D. in clinical psychology" to the University of Cumberland's leadership.[1]  [R. 44-4 at 8.]  The leadership at the University were intrigued by the idea

---

[1]       As explained in more detail *infra* IIA, the Court considers the facts in a light most favorable to the non-moving party.  *Logan v. Denny's, Inc.*, 259 F.3d 558, 566 (6th Cir. 2001) (*citing Liberty*

and Dr. Geissler and two other faculty members began designing a Clinical Psychology Ph.D. program.  [R. 44-1; R. 44-4 at 8.]  Ultimately, Dr. Geissler was chosen to lead the new program, and in May 2011, he sent a solicitation email to students attending St. Christopher's College of Medicine, in Cambridge, England, where he had served as chancellor between 2000-2002.  [R. 1 at ¶ 8; R. 44-5 at 20.]  On the recommendation of a former colleague, and as a "recruiter acting for and on behalf of the University of the Cumberlands," Geissler directly recruited Doctors Sameer and Omar Suhail.  [R. 44-5 at 21.]  Succeeding in his efforts, the Suhail brothers enrolled in the program at the University of the Cumberlands in the summer of 2011.  [R. 1 at ¶ 2-3.]  In addition to bringing them in as students, Dr. Geissler also offered Dr. Sameer Suhail positions as both Clinical Director and Assistant Professor of Psychiatry, with the expectation that he would commence his work in those roles in August 2012.  [R. 1 at ¶ 64-73; R. 43-15; R. 43-16.]  Dr. Sameer Suhail promptly accepted the offer of employment.  [R. 43-17.]

At the time of their enrollment, the Clinical Psychology program requirements were outlined in the University's 2011-2012 Course Catalog.  [R. 1 at ¶ 3; R. 1-3.]  The catalog represented that "the Ph.D. in Clinical Psychology degree program offered by University *should fulfill* the educational requirements for licensure in 37 states or jurisdictions," [R. 1-3 at 19 (emphasis added)] one of which was Kentucky:

---

*Lobby*, 477 U.S. at 255).  "When reviewing cross-motions for summary judgment, [the Court] must evaluate each motion on its own merits and view all facts and inferences in the light most favorable to the nonmoving party."  *Westfield Ins. Co. v. Tech Dry, Inc.*, 336 F.3d 503, 506 (6th Cir. 2003) (*citing Taft Broad. Co. v. United States,* 929 F.2d 240, 248 (6th Cir.1991)).

**States for Which Program Fulfills Educational Licensure Requirements**
Based upon a review of state law and licensure regulations, the Ph.D. in Clinical Psychology degree program offered by University of the Cumberlands should fulfill the educational requirements for licensure in 37 states or jurisdictions. Additional information on state requirements may be found on the ASPPB website. See the state requirements link on the homepage at http://www.asppb.net or review the Jurisdictional Handbooks available at http://www.asppb.org/HandbookPublic/HandbookReview.aspx.

The Ph.D. in Clinical Psychology degree program offered by University of the Cumberlands should fulfill the educational licensure requirements in these states or jurisdictions:

| | | |
|---|---|---|
| 1. Alabama | 14. Kentucky | 27. Oregon |
| 2. Arizona | 15. Louisiana | 28. Pennsylvania |
| 3. Arkansas | 16. Maryland | 29. South Carolina |
| 4. California | 17. Massachusetts | 30. South Dakota |
| 5. Colorado | 18. Michigan | 31. Tennessee |
| 6. Connecticut | 19. Montana | 32. Vermont |
| 7. Delaware | 20. New Hampshire | 33. Virginia |
| 8. District of Columbia | 21. New Jersey | 34. Washington |
| 9. Hawaii | 22. New Mexico | 35. West Virginia |
| 10. Idaho | 23. New York | 36. Wisconsin |
| 11. Indiana | 24. North Carolina | 37. Wyoming |
| 12. Iowa | 25. North Dakota | |
| 13. Kansas | 26. Ohio | |

[R. 1-3 at 19.]  The Catalog also held out to "provide a foundation for postdoctoral training in psychopharmacolocy as required for licensure in medical psychology in the two states that have granted clinical psychologists prescriptive authority."  [R. 43-2 at 4.] The Suhails paid their tuition and began the program in Fall 2011.

During the 2011-2012 academic year, after the Program's first class of students were already enrolled, the University began having doubts about Dr. Geissler's management of the program.  [R. 44-4 at 13.]  Dr. Cockrum, the University's Vice-President, asked Dr. Owen Nichols, a member of the Kentucky Board of Examiners of Psychology, to review the program's curriculum which Geissler had been responsible for developing.  [R. 44-1 at 6; R. 44-4 at 13.]  Dr. Nichols informed the University that the program did not satisfy Kentucky's licensure requirements and recommended changes in the program so that students graduating from the program would actually be qualified for licensure in the Commonwealth.

3

In March 2012, Dr. Cockrum recommended that the University not renew its contract with Dr. Geissler. According to Dr. Cockrum, Dr. Geissler "didn't always do things by the book," elaborating that he had exercised too much independence in bringing people into the program and also that the program failed to meet Kentucky's licensure requirements. [R. 44-4 at 12-13.] Dr. Geissler's contract was not renewed. [*Id.*]

As a result of Dr. Nichol's recommendations, an updated course catalog was published for the 2012-2013 academic year which included the following additional requirements for the program: an 1800 hour internship requirement, additional courses and a competency examination. [R. 1 at ¶¶ 3-4, 11; R. 1-4; R. 1-6.] The new catalog stated the following about licensure requirements:

> The Ph.D. in Clinical Psychology degree program offered by University of the Cumberlands fulfills the educational licensure requirements for the state of Kentucky. It is our goal to provide the educational licensure requirements for many additional states. It is up to the student to contact their interested state Board of Psychology to inquire if we meet their educational standards.

[R. 1-6 at 15.] The University explains that these changes were made to "to accommodate both the needs of their students and the Kentucky licensure requirements." [R. 44-1 at 2.]

In an October 22 email, the University notified students in the Ph.D. program of the changes in the Clinical Psychology Ph.D. Program. [R. 44-17.] According to the Suhails, they did not learn of the additional requirements until February 2013, only a few months away from their anticipated completion of the program. [R. 1 at ¶ 12.] According to the University, Dr. Sameer Suhail's first complaint about the changed graduation requirements came by way of a March 4, 2013 letter to Dr. Russ Radenhausen

4

and Dr. Cockrum, wherin he asked to be allowed to complete the program in accordance with the original program requirements.  [R. 44-1 at 16; R. 44-23.]  The letter was ultimately directed to Dr. Kristy Keefe, who had taken over as the program's director following Dr. Geissler's departure.  Dr. Keefe met with Dr. Sameer Suhail and offered him options for how to proceed if he did not want to complete the 1,800 hour internship.  [R. 44-26.]  According to Keefe, he had three options: obtain a master's degree in psychology, obtain a Ph.D. under the terms of the original catalog but forgo licensure in Kentucky and other states that require a pre-doctoral internship, or obtain a Ph.D. under the terms of the amended catalog.  [R. 44-1 at 17; R. 44-26.]

The Suhails were "shocked and upset to hear about the additional requirements," and argue that they "cannot and should not be required to complete the several additional requirements in order to receive their degree and licensure."  [R. 1 at ¶ 15-21.]  Separate from claims about the program's modification, Dr. Sameer Suhail also alleges the University breached its employment contract with him when he was not permitted to assume his positions as "clinical director" and "assistant professor" in August 2012.  [R. 1 at ¶ 64-73.]

## II

## A

Summary judgment is appropriate where "the pleadings, discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2); *Celotex Corp. v. Catrett,* 477 U.S. 317, 323-25 (1986).  "A genuine dispute

5

exists on a material fact, and thus summary judgment is improper, if the evidence shows 'that a reasonable jury could return a verdict for the nonmoving party.' " *Olinger v. Corp. of the President of the Church*, 521 F. Supp. 2d 577, 582 (E.D. Ky. 2007) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)).

In deciding a motion for summary judgment, the Court must review the facts and draw all reasonable inferences in favor of the non-moving party. *Logan v. Denny's, Inc.*, 259 F.3d 558, 566 (6th Cir. 2001) (*citing Liberty Lobby*, 477 U.S. at 255). In terms of burden shifting, the moving party has the initial burden of demonstrating the basis for its motion and identifying those parts of the record that establish the absence of a genuine issue of material fact. *Chao v. Hall Holding Co., Inc.*, 285 F.3d 415, 424 (6th Cir. 2002). The movant may satisfy its burden by showing "that there is an absence of evidence to support the non-moving party's case." *Celotex*, 477 U.S. at 325. Once the movant has satisfied this burden, the non-moving party must go beyond the pleadings and come forward with specific facts to demonstrate there is a genuine issue. *Hall Holding*, 285 F.3d at 424 (*citing Celotex*, 477 U.S. at 324.) Moreover, "the nonmoving party must do more than show there is some metaphysical doubt as to the material fact. It must present significant probative evidence in support of its opposition to the motion for summary judgment." *Id*. (internal citations omitted).

The trial court is under no duty to "search the entire record to establish that it is bereft of a genuine issue of material fact." *In re Morris*, 260 F.3d 654, 655 (6th Cir. 2001) (*citing Street v. J.C. Bradford & Co*., 886 F.2d 1472, 1479-80 (6th Cir. 1989)). Instead, "the nonmoving party has an affirmative duty to direct the court's attention to

those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact." *In re Morris*, 260 F.3d at 655.

## B

The Suhail brothers move for summary judgment as to their breach of contract claim, claim that the University engaged in deceptive business practices in violation of KRS 367, and Dr. Sameer Suhail also argues there is no disputed fact as to his claim that the University breached its agreement to employ him.  [R. 43.]  The University moves for summary judgment on all counts.  [R. 44.]

## 1

The Suhails argue the 2011-2012 course catalog "contained all the essential terms under which they were to complete the program and become entitled to a degree conferred by the University."  [R. 43 at 8.]  According to the Suhails, they depended on the terms stated in the course catalog, substantially performed their obligations as laid out in it, and the University breached that "agreement" when it subsequently changed the degree requirements.  The Suhails now ask the Court to find a contract existed between the University and themselves, and that the University breached this contract when it amended the program requirements.  [R. 43 at 8.]

The University concedes that a contractual relationship existed, but argues that the standard for proving a breach of contract is heightened in cases dealing with Universities. They argue that the Suhails must show the University's behavior was arbitrary, capricious, or in bad faith.  [R. 44-1 at 23.]  Because they believe that the Suhails are

unable to show such malicious intent on behalf of the University they argue that summary judgment is appropriate on this count. The Court agrees.

The Suhails assert a state law breach of contract claim so Kentucky law applies. Both parties direct the Court to *Lexington Theological Seminary v. Vance*, 596 S.W. 2d 11 (Ky. 1979), a case in which the Kentucky Court of Appeals considered whether a seminary could refuse to grant a degree to a student who had completed all his course requirements, but had also disclosed that he was homosexual and married to a man. *Id*. The Court recognized at that time that "[t]he terms and conditions for graduation from a private college or university are those offered by the publications of the college at the time of enrollment and, as such, have some of the characteristics of a contract. *Id*. (*citing University of Miami v. Militana*, Fla.App., 184 So.2d 701, 704 (1966)). Much more recently, in *Centre College v. Trzop*, the Kentucky Supreme Court again recognized that "[t]he relationship between a private college and its students can be characterized as contractual in nature." 127 S.W. 3d 562 (Ky. 2003); *see also Stathis v. Univ. of Kentucky*, 2005 WL 1125240, at *9 (Ky. Ct. App. May 13, 2005) (Recognizing that the relationship between a private college and students is contractual in nature and extending the rule to apply to public universities.); *Amaechi v. Univ. of Ky.*, 2003 U.S. Dist. LEXIS 27231, *25 (E.D. Ky. 2003) ("Courts have, on occasion, reasoned that there is a contractual relationship between a student and the college...)

The nature of an implied contract between a University and its students is determined by looking at the " 'brochures, course offering bulletins, and other official statements, policies and publications of the institution.' " *Id*. (quoting *Wilson v. Illinois*

*Benedictine College*, 112 Ill. App. 3d 932, 445 N.E.2d 901 at 906, 68 Ill. Dec. 257 (1983)).  "The rights and obligations of the parties as contained in the University's bulletins, circulars and regulations made available to the student become a part of the implied contract." *Stathis v.*, 2005 WL 1125240, at *9 (*citing Vought v. Teachers College, Columbia University,* 127 A.D.2d 654, 511 N.Y.S.2d 880, 881 (N.Y.1987)).

Notwithstanding the existence of a contract, Courts are generally hesitant to intervene in the affairs of academic institutions.  As stated in *Vance*, "courts will not generally interfere in the operations of colleges and universities, especially in actions challenging the institution's academic regulations, since the courts possess minimum expertise in this area."  596 S.W.2d at 14 (*citing Depperman v. University of Kentucky*, 371 F. Supp. 73, 76 (E.D. Ky. 1974)).  In keeping with this tradition of deference, the University argues that the Suhails can only recover on a breach of contract when the University acts "arbitrarily, capriciously or in bad faith."  [R. 44-1 at 23.]  Citing *Wilson v. Illinois Benedictine College*, they argue:

> A student may have a remedy when it is alleged that an adverse decision concerning the student, supposedly for academic deficiencies, was made arbitrarily and capriciously and in bad faith…; thus a university may not act maliciously or in bad faith by arbitrarily and capriciously refusing to award a degree to a student who fulfills its degree requirements."

112 Ill. App. 3d 932, 445 N.E.2d 901 at 906, 68 Ill. Dec. 257 (1983).

This same sentiment was expressed by the Sixth Circuit in *Doherty v. S. Coll. of Optometry*, where it considered whether a private college breached an implied contract with one of its students when it amended program requirements to include an additional clinical proficiency exam after the student had begun the program.  862 F.2d 570 (6th

Cir. 1988).  In *Doherty,* the Court explained the deference traditionally given to academic institutions:

> Before we examine plaintiff's contractual theories under state law, we note that this case arises in an academic context where **judicial intervention in any form should be undertaken only with the greatest reluctance**. *See, e.g., Regents of Univ. of Michigan v. Ewing,* 474 U.S. 214, 226, 106 S.Ct. 507, 514, 88 L.Ed.2d 523 (1985) (declaring federal courts unsuited "to evaluate the substance of the multitude of academic decisions that are made daily by faculty members of public educational institutions"). **The federal judiciary is ill equipped to evaluate the proper emphasis and content of a school's curriculum**. *Board of Curators of Univ. of Missouri v. Horowitz,* 435 U.S. 78, 89–91, 98 S.Ct. 948, 954–56, 55 L.Ed.2d 124 (1978). **This is the case especially regarding degree requirements in the health care field when the conferral of a degree places the school's imprimatur upon the student as qualified to pursue his chosen profession**. *See Jansen v. Emory Univ.,* 440 F.Supp. 1060, 1062–63 (N.D.Ga.1977), *affd,* 579 F.2d 45 (5th Cir.1978); *Olsson v. Board of Higher Educ.,* 49 N.Y.2d 408, 413, 402 N.E.2d 1150, 1153, 426 N.Y.S.2d 248, 251 (1980) ("In order for society ... to have complete confidence in the credentials dispensed by academic institutions ... the issuance of these credentials [must] be left to the sound judgment of the professional educators"). This judicial deference to educators in their curriculum decisions is no less applicable in a clinical setting because evaluation in a clinical course "is no less an 'academic' judgment because it involves observation of ... skills and techniques in actual conditions of practice, rather than assigning a grade to ... written answers on an essay question." *Horowitz,* 435 U.S. at 95, 98 S.Ct. at 958 (Powell, J., concurring) (footnote omitted).

*Id.* at 576-577 (emphasis added).  After determining that Tennessee had not "enunciated the standard which should be applied in a dispute arising out of the university-student relationship," the Court concluded that the proper standard to apply is the "the deferential standard of reasonable expectation—what meaning the party making the manifestation, the university, should reasonably expect the other party to give it."  *Id.* at 577 (quotation marks omitted).  They were of the further "opinion that implicit in the university's general "contract" with its students is a right to change the university's academic degree requirements if such changes are not arbitrary or capricious."  *Id.* (*citing Mahavongsanan*

*v. Hall*, 529 F.2d 448, 450 (5th Cir. 1976) ("Implicit in the student's contract with the university upon matriculation is the student's agreement to comply with the university's rules and regulations, which the university clearly is entitled to modify so as to properly exercise its educational responsibility."); *Nuttelman v. Case Western Reserve Univ.*, 560 F.Supp. 1, 3 (N.D.Ohio 1981), *aff'd,* 708 F.2d 726 (6th Cir.1982); *Jansen v. Emory Univ.*, 440 F. Supp. 1060, 1062-1063 (N.D. Ga. 1977), aff'd, 579 F.2d 45 (5th Cir. 1978)) (additional citations omitted.))

The circumstances presented here are not all that different, from those presented in *Doherty*, 862 F.2d 570.  As Tennessee law was found to be silent on what standard of review is appropriate in *Doherty,* so too Kentucky law is silent on what standard of review should apply to disputes arising out of the university-student relationship. Accordingly, the Court will apply the standard employed by the Sixth Circuit in *Doherty* and will construe the implied contract according to "the deferential standard of reasonable expectation" and only if changes made to the university's academic degree requirements are arbitrary and capricious will the University be found to be in breach. *Doherty*, 862 F.2d at 577.

According to the University, the Advancement to Candidacy Examination, the 1800-hour pre-doctoral internship requirement, and the two additional courses were all added as program requirements to ensure compliance with Kentucky's licensure requirements.  [R. 43-6.]  The Suhails argue that the University's motivations in amending its curriculum are irrelevant, but they are wrong.  *See* R. 43 at 10.  Quite to the contrary, the University's motivations in amending the program requirements are critical

11

as the University can only be found in breach if its behavior was arbitrary or capricious. While the University might be culpable for misrepresenting the program or engaging in deceptive practices, a charge addressed *Infra* II B 2, it cannot be said that it acted arbitrarily or capriciously in bringing its program into compliance with Kentucky's licensure requirements.  The University learned of the program's deficiencies and took strides to bring it into accord with what they advertised.

Furthermore, to the contrary of representations made in their motion for summary judgment, Dr. Sameer Suhail (and presumably his brother) were offered the opportunity to complete the program under the original program requirements (i.e. under the terms of the implied contract) with one minor exception—that he take the new Advancement to Candidacy Examination.  [R. 43 at 10; R. 44-26.]  Such a minor change to the program is well within the University's discretion and is justifiable.  As Kristy Keefe explains, the exam was added so that the University had "an evaluation of basic skills before entering clinical practicum of the students" so that they could be ensured that the students "met a benchmark of basic skills in order to practice under supervision."  [R. 44-6 at 66.] Students could take the exam as many times as needed to pass it.  [R. 44-28.]

Ultimately, whether or not the Suhails were able to obtain licensure following the completion of the program was outside the University's control.  The Court understands that, based on the University's representations, and under the terms of the original course catalog, the Suhails expected to be eligible for that licensure.  The immediate question for the Court, however, is not whether the University enticed students to enroll in the Clinical Psychology Ph.D. program on the basis of inaccurate representations made in the course

catalog, but rather whether the University's actions in modifying that catalog were arbitrary or capricious. They were not. Universities are afforded great deference in developing their academic curriculum. In keeping with that deference, and because the University's actions in updating the Clinical Psychology Program curriculum were neither arbitrary nor capricious, the University is entitled summary judgment on this claim.

**2**

The Suhails also allege that the University engaged in deceptive business practices in violation of the Kentucky Consumer Protection Act, KRS 367, et. seq. [2] [R. 1 at 7-9.] Specifically, they argue that the University solicited the Plaintiffs for a three-year clinical psychology program that would result in students being eligible to sit for a licensure examination in 37 states and eligible to apply for prescriptive authority in two states. [R. 43 at 12.] According to the Suhails, these representations were false, misleading, and in violation of Kentucky law. [R. 43 at 12-17.] The University argues that the KCPA does not apply and, even if it did, that the Suhails have failed to demonstrate that the University's actions were either intentional or grossly negligent. [R. 44-1 at 30.] Both parties move for summary judgement on this count.

As noted by the University, the Kentucky Consumer Protection Act is designed "to protect the public interest and the well-being of both the consumer public and the

---

[2]       In their motion for summary judgment, the Suhails also appear to argue that the University committed the tort of fraudulent misrepresentation. *See* R. 43 at 14. This was not an allegation levied in the complaint and it will not be considered here.

ethical sellers of goods and services."  KRS § 367.120.  It provides a cause of action to those who believe they have been harmed in violation of the Act.

> Any person who purchases … **goods or services** primarily for **personal, family or household purposes** and thereby suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment by another person of a method, act or practice declared unlawful by KRS 367.170, may bring an action … to recover actual damages.

KRS § 367.220 (emphasis added).  The Act defines "unlawful acts" as those that are "[u]nfair, false, misleading, or deceptive acts or practices in the conduct of any trade or commerce." KRS § 367.170.  "Unfair" is further defined as unconscionable.  *Id.*

As a threshold matter, the University offers numerous reasons why they believe that the Suhails cannot maintain a KCPA claim.  First, the University argues that it may not be sued under this act because it does not engage in a "trade" or "commerce" as required by the KCPA.

> "Trade" and "commerce" means the advertising, offering for sale, or distribution of any services and any property, tangible or intangible, real, personal or mixed, and any other article, commodity, or thing of value, and shall include any trade or commerce directly or indirectly affecting the people of this Commonwealth.

KRS § 367.110.  The University directs the Court to *Simmons v. Stephenson,* 84 S.W.3d 926, 927 (Ky. Ct. App. 2002), where the Kentucky Court of Appeals decided that a doctor did not engage in a "trade" or "commerce" within the meaning of KCPA when he performed eye surgery on a patient since it "did not relate to the entrepreneurial, commercial, or business aspect of [the Doctor's] practice of medicine."  *Simmons,* 84 S.W.3d at 927.  The University also cites to *McMillin v. Lincoln Memorial University*, where the Tennessee Court of Appeals considered the question of whether "education falls within the ambit of the Tennessee Consumer Protection Act."  2011 WL 1662544, at

14

*7 (Tenn. Ct. App. May 3, 2011).  In *McMillin*, the Plaintiff complained that the University's award of "special credits" (to expedite the awarding of a degree and to settle a pending federal lawsuit) would harm future employment endeavors, but the Tennessee Court concluded that, under those facts, the University was not engaged in trade or commerce.  *Id.* at *8.  Nothing in that case, however, foreclosed the possibility of a claim against a university being raised under the TCPA under different facts.

Other states have explicitly foreclosed the possibility of universities being sued under consumer protection acts.  For example, in Massachusetts, the rule is that "universities and other charitable institutions do not engage in 'trade or commerce' …when they engage in activities in furtherance of their core mission, as opposed to activities undertaken in a business context."  *Brodsky v. New England Sch. of Law*, 617 F. Supp. 2d 1, 7 (D. Mass. 2009) (*citing Thornton v. Harvard Univ.,* 2 F.Supp.2d 89, 95 (D.Mass.1998) (*citing Linkage Corp. v. Trs. of Boston Univ.,* 425 Mass. 1, 679 N.E.2d 191 (1997))).  No such case law exists in Kentucky.

The Suhails directly challenge the University's tactics in recruiting students, a practice that is most certainly commercial or entrepreneurial, rendering *Simmons* inapposite.  This point is stressed by Dr. Geissler in his deposition testimony.  When asked whether there was pressure from the university to recruit students, Dr. Geissler responded "You know, I don't even know how to answer such a stupid question, and I apologize here, but, I mean, of course, without the students, there is no program, and without the students, you can't pay the bills."  [R. 43-5 at 20.]  The facts of this case are also distinct from those presented in *McMillin*.  The Suhails allege that the University

suggested that a degree from the University would qualify students for licensure, in order to solicit potential students who would pay for the program—behavior that is commercial in nature.

Second, the University argues the Suhails are outside the class of persons that the KCPA is intended to protect because the services they received from the University were not for "personal, family or household purposes." KRS 367.220. They direct the Court to *Keeton v. Lexington Truck Sales, Inc.*, where the Kentucky Court of Appeals held that a Plaintiff was outside the KCPA's protected class when he purchased a truck for commercial purposes as opposed to personal, family or household purposes. 275 S.W.3d 723 (Ky. Ct. App. 2008). The University contends that the Suhail brothers similarly sought their degree so that they would then be able to "engage in a commercial venture, i.e. the practice of psychology." [R. 44-1 at 29.]

A case not cited by either party, *MacDonald v. Thomas M. Cooley Law School,* 880 F. Supp. 2d 785 (W.D. Mich. 2012), aff'd, 724 F.3d 654 (6th Cir. 2013), is instructive. In *MacDonald*, students of Cooley law school alleged that the law school disseminated false employment data which enticed them to attend, in violation of Michigan's Consumer Protection Act. As in Kentucky, the Michigan Consumer Protection Act only protects those utilizing products, goods, or services, for "personal, family, or household purposes." M.C.L. §§ 445.903(1), 445.902(1)(g). In *Cooley*, the Court concluded that the Act did not protect the students as they sought "their JD degree to prospectively better themselves and their personal circumstances *through the*

16

*attainment of full-time employment in the legal sector.*"  880 F. Supp. 2d 785, 790 (*citing to the record*) (emphasis in original).  The Court went on to explain:

> Plaintiffs did not purchase a Cooley legal education so that they could leisurely read and understand Supreme Court Reports, or to provide legal services for themselves or family members. Rather, Plaintiffs purchased a legal education in order to make money as lawyers so that they could live a lifestyle that they believed (perhaps naively) would be more pleasing to them. This is a business purpose. Of course, making more money can lead to happiness, or not. For example, purchasing a new woodworking machine might make the owner of a small furniture company more productive, more money, and, therefore, happier, but the purchase is still for business or commercial rather than for personal purposes. Even the president of a major company of one type or another

880 F. Supp. 2d 785, 792.  The Sixth Circuit subsequently affirmed the District Court's decision, but importantly noted that "[i]f, for example, the graduates had alleged that they attended Cooley to get a legal education with no intention of using it to make money, then the district court might have erred in holding that the Act did not apply."

*MacDonald v. Thomas M. Cooley Law Sch.,* 724 F.3d 654, 661 (6th Cir. 2013).  The critical point is that the students' motivations in attaining a degree matter.

Many persons seek higher education for personal reasons unrelated to commerce and, in this case, Sameer Suhail testified that he "like[s] to get degrees and hang them on the wall" and that "Psychology is what [he] wanted to do through [his] life." [R. 44-2 at 24.]  Omar Suhail testified that his plan was to practice as a licensed psychologist in either Louisiana or New Mexico, where he anticipated having prescriptive authority.  [R. 44-3 at 5.]  In their response to the Defendant's motion for summary judgment, the Plaintiffs are adamant that they "did not enroll in the Program for commercial purposes" and that "[t]heir enrollment is part of their quest in obtaining higher education and

17

possibly moving on to obtaining licensure and prescriptive authority in the future." [R. 48 at 6.] In their complaint, the Suhails explain that their "main reason in joining said Program centered on their ability to qualify for a prescriptive authority for clinical psychologists program in the states of New Mexico and Louisiana…" [R. 1 at 8.]

Even considering these statements in the light most favorable to the Suhails, the Court cannot conclude that the Suhails decision to pay tuition and seek a degree from the University was "*primarily* for personal…purposes." KRS § 367.220 (emphasis added). The impetus behind this lawsuit is that the Suhails have been unable to obtain licensure and prescriptive authority—recognitions that exist to qualify individuals for employment and compensation. As the Sixth Circuit noted in *MacDonald*, had the Suhails alleged that they attended the University of the Cumberlands to get an education "with no intention of using it to make money," then the KCPA might apply. *MacDonald,* 724 F.3d at 661. That has not happened. As in *MacDonald*, the Suhails sought a degree for a business, as opposed, to personal purpose. Under these facts, they cannot maintain a claim under the KCPA and so summary judgment must be granted to the University on this point.

**3**

In *Craft v. Rice*, the Kentucky Supreme Court adopted the approach of the Restatement Second of Torts in defining the tort of outrage, also called the intentional infliction of emotional distress: "(1) One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for

such bodily harm." 671 S.W.2d 247, 251 (Ky. 1984). In a later decision, the Supreme

Court summarized what is necessary to prove a prima facie case of outrage:

> 1) the wrongdoer's conduct must be intentional or reckless;
> 2) the conduct must be outrageous and intolerable in that it offends against the generally accepted standards of decency and morality;
> 3) there must be a causal connection between the wrongdoer's conduct and the emotional distress; and
> 4) the emotional distress must be severe.

*Stringer v. Wal-Mart Stores, Inc.,* 151 S.W.3d 781, 788 (Ky. 2004) (citations omitted).

To state a claim for intentional infliction of emotional distress under Kentucky

law, the Suhails must show, among other things, that the University engaged in conduct

that was "outrageous" or "a deviation from all reasonable bounds of decency and is

utterly intolerable in a civilized community." *Stringer v. Wal-Mart Stores, Inc.*, 151

S.W.3d 781, 791 (Ky. 2004).

The Suhails charge "[t]hat the University's eleventh hour changes to a Ph.D.

Program are incomprehensible and extremely distressing" and "[t]hat as a result, Dr.

Sameer and Dr. Omar have suffered severe and extreme emotional distress because of the

University's outrageous and unexcused actions." [R. 1 at 11.] In responses to

interrogatories, each of the Suhail brothers stated that they "suffered severe and

emotional distress because of the University's extreme change in the Program

requirements." [R. 44-33 at 2; R. 44-34 at 2.] The University argues that the Suhails

allegations, even if proven, are not outrageous enough to support the tort. They are right.

Even if the Suhail brothers' surviving claims are all proven to be true, they are

insufficiently outrageous to cross the high threshold of an intentional infliction of

emotion distress.  *See Harman*, 2005 WL 1353752, at *7 (Finding that even if a University intentionally misled a student into thinking that a Radiology Technologist program was properly accredited and qualified her to take a national certifying exam, "the conduct does not rise to the level of egregious conduct required for the tort of intentional infliction of emotional distress.")  There is no genuine issue of material fact on the question of whether the University behaved in such a way that deviates from "all bounds of decency" or that is "utterly intolerable in a civilized community."  *Stringer,* 151 S.W.3d at 791.  As such, summary judgment is appropriate as to the Suhail's claims for the intentional infliction of emotional distress.

**4**

Dr. Sameer Suhail also charges the University with breaching an oral agreement to employ him.  [R. 1 at 11.]  The University concedes that Dr. Geissler offered Dr. Sameer Suhail the positions at issue, and that Dr. Suhail accepted the positions, but argues that Dr. Suhail's cause of action still fails as a matter of law.

First, the University argues that the offer was insufficient to bind the University because it was not within Dr. Geissler's authority to offer such employment.  [R. 44-1 at 33.]  According to Dr. Cockrum, only the University's President was actually authorized to hire and fire faculty members.  [R. 44-4 at 13.]  The Suhails offer no evidence to rebut this point.  Just because Geissler lacked actual authority to extend offers of employment does not mean, however, that he was not acting within his apparent authority.  Apparent authority "is the authority the agent is held out by the principal as possessing. It is a matter of appearances on which third parties come to rely."  *Mill St. Church of Christ v.*

20

*Hogan*, 785 S.W.2d 263, 267 (Ky. Ct. App. 1990) (citations omitted); *see also Paintsville Hosp. Co. v. Rose,* 683 S.W.2d 255, 256-57 (Ky.1985).  Particularly important to this case, "[i]t matters not that the agent acts contrary to the instructions of his principal where a third person with whom he deals is ignorant of his circumscribed authority or has no reason to believe he is exceeding it or violating the instructions of his principal." *P & J Res., Inc. v. Superior Well Servs., Inc.*, No. CIV.A. 09-95-ART, 2010 WL 1416791, at *3 (E.D. Ky. Apr. 5, 2010) (quoting *Clark v. Burden,* 917 S.W.2d 574, 579 (Ky.1996) (quoting *Am. Nat. Red Cross v. Brandeis Mach. & Supply Co.,* 286 Ky. 665, 151 S.W.2d 445 (1941))).

There is much discussion about whether Peter Geissler knew that he was exceeding his authority in hiring Dr. Suhail.  In his deposition, Dr. Geissler maintains that making employment offers on behalf of the University was one of his duties.  [R. 44-5 at 60.]  Dr. Cockrum testified, however, that after he received emails from Dr. Geissler regarding Dr. Sameer's proposed employment, he would always call Dr. Geissler to advise him that he was not authorized to extend offers of employment.  [R. 43-11 at 17-28.]  Dr. Geissler contends these phone conversations never took place but, whether or not they did is really inconsequential.  [R. 43-12 at 5.]  What is important is whether Dr. Suhail knew that Dr. Geissler lacked the authority to offer him employment.  *P & J Res., Inc.*, 2010 WL 1416791, at *3.  As noted by Dr. Suhail, Dr. Cockrum was copied on much of the correspondence regarding his employment and there was never any indication in that correspondence that Geissler lacked authority to make the hire.

Without evidence that Dr. Suhail was aware of Geissler's lack of authority, the Court cannot find for the Defendants on this point.

Second, assuming that Geissler was operating under apparent authority, the University maintains that summary judgment is still appropriate because employment in Kentucky is "at-will," so Suhail could be fired without cause. This is an oversimplification of Kentucky law. It is true in Kentucky that employment is "at-will," meaning that absent a contract for employment indicating contrary intentions, "an employer may discharge his at-will employee for good cause, for no cause, or for a cause that some might view as morally indefensible." *Bishop v. Manpower, Inc. of Cent. Kentucky,* 211 S.W.3d 71 (2006) (quoting *Firestone Textile Co. v. Meadows,* 666 S.W.2d 730, 731 (Ky.1983)). Employees (or employers) can get around this "at-will" status by entering into one of two specific types of employment contracts:

> First, an employer may offer employment for a definite period of time. *Otis and Co. v. Power,* 1 Ky.Op. 312 (Ky.1886). Second, an employer may offer employment for an indefinite period of time with a covenant not to terminate without cause. *Shah v. American Synthetic Rubber Corp.,* 655 S.W.2d 489 (Ky.1983).

*McNutt v. Mediplex of Kentucky, Inc.*, 836 F. Supp. 419, 420 (W.D. Ky. 1993). In this case, there is no suggestion that the University's offer included a covenant not to terminate without cause, so only the first circumstance is potentially implicated.

It is not disputed that Dr. Geissler offered Dr. Sameer Suhail the position of "Assistant Professor" and "Clinical Director." [R. 43-15; R. 44-1 at 33.] A copy of the email in which that offer was extended is reprinted below:

22

Dear Dr. Sameer Suhail, M.D.,

It is with great pleasure that I am able to offer you a part-time teaching position at University of the Cumberlands commencing October 2012.

Your academic appointment is that of "Assistant Professor of Psychiatry" at University of the Cumberlands.

The position is a 60% part-time teaching post in Cincinnati during the 2012-2013 academic year.

Your salary is $36,000 for teaching two courses during each of three 8-week sessions. Thus, altogether you shall teach six graduate-level courses. You shall teach a 3-term sequence of courses (830-series) covering the neurosciences at a level required to understand pharmacology. In addition, you shall teach a 3-term sequence of courses (840-series) covering psychopharmacology in depth.

Classes in Cincinnati are held on Monday, Tuesday & Wednesday (only). Each week, classes start at 1pm Monday and end at 5pm Wednesday. Thus, you may wish to simply commute to Cincinnati each week. Sadly, University of the Cumberlands cannot pay for either accommodations in Cincinnati or commute costs. These costs are your sole responsibility.

Your salary of $36,000 and has been calculated on the basis of a $60,000 pay grade for fulltime employment. However, fulltime employment at University of the Cumberlands requires teaching ten (10) such courses per year. We only need you to teach six (6) courses.

[R. 43-15.] Suhail was offered $36,000 in compensation for his teaching two courses during three different eight-week sessions during the 2012-2013 academic year. *Id*. Additionally, at the very bottom of the email, it stated:

Our aim is to employ you to teach these same six (6) courses in Cincinnati each year. However, we can only offer you a 1-year employment contract that is subject to renewal by agreement of the parties.

[R. 43-15 at 2.] Dr. Geissler informed Dr. Cockrum that the offer had been extended and, a couple days later, in response to the news that Dr. Suhail had accepted the position, Dr. Cockrum responded, "It looks like the pieces are fitting together quite well. Thank you for your work." [R. R. 43-16; R. 43-17; R. 43-18.]

The question for the Court is whether the above offer of employment was for a definite period of time or if Dr. Suhail's employment was intended to be terminable at the will of either party. In answering this question, the Court is to look "not [to the]

23

subjective intentions but outward manifestations" of the parties.  *McNutt*, 836 F. Supp. 420 (*citing Hines v. Elf Atochem North America, Inc.,* 813 F.Supp. 550 (W.D.Ky.1993); *see also* 17A Am.Jur.2d *Contracts* §§ 27 and 28 (1991)).

> The duration of an employment contract must be determined by the circumstances of each particular case, depending upon the understanding of the parties as ascertained by inference from their written or oral negotiations and agreements, the usage of business, the situation and objectives of the parties, the nature of the employment, and all circumstances surrounding the transaction.

*Shah v. Am. Synthetic Rubber Corp.,* 655 S.W.2d 489, 490 (Ky.1983).  Only if Dr. Suhail reasonably understood that he was being offered employment for a definitive amount of time can there be an employment contract.  *Id.*

Viewing the evidence in the light most favorable to Dr. Suhail, it was reasonable for him to believe that the University's offer was for a definite amount of time.  Unlike in *McNutt*, Suhail was not only offered an annual salary, he was offered employment for the 2012-2013 academic year.  To the extent that Suhail had any doubt, it was made clear by Dr. Geissler who explained that the University "can only offer you a 1-year employment contract."  [R. 43-15 at 2.]  Dr. Suhail accepted this offer and, as a result, could only have been discharged with cause.

In its briefing, the University suggests that Dr. Suhail admitted in his deposition testimony that he was unqualified for the position he would be assuming.  The Court has reviewed Dr. Suhail's testimony and it is more nuanced than the University's brief suggests.  Whether or not Dr. Suhail concedes his lack of qualifications is a question that can be answered by the jury when they consider whether or not sufficient cause was given for his termination.

### III

Accordingly, it is hereby **ORDERED** as follows:

1.   The Plaintiff's Motion for Summary Judgment [R. 43] shall be **GRANTED** in **PART** as to Count Four (Breach of an Employment Contract) and **DENIED** as to the remaining claims; and,

2.   The Defendant's Motion for Summary Judgment [R. 44] shall be **GRANTED** as to Count One (breach of contract), Count Two (Kentucky Consumer Protection Act) and Count Three (intentional infliction of emotional distress) and **DENIED** as to the Count Four.

This 28th day of May, 2015.

Signed By:

*Gregory F. Van Tatenhove*

United States District Judge